OPINION OF THE COURT
Joseph Harris, J.
The context of this motion is a medical malpractice action in which Metropolitan Life Insurance Company (hereinafter Metropolitan or Met Life) and Lucent Technologies, Inc. (hereinafter Lucent) move to intervene as plaintiffs, pursuant to CPLR 1012, or, alternatively, CPLR 1013, to protect their subrogation rights against plaintiff and defendants. The plaintiff and defendants all oppose the motions to intervene.
FACTS
The facts underlying this motion are as follows. In September 1983, plaintiff’s conservatee, Cornelius Berry (hereinafter *217 Berry), was admitted to St. Peter’s Hospital to undergo diagnostic/surgical procedures including fiber-optic bronchos-copy under fluoroscopy. Berry was anesthetized for the procedure. During the procedure, Berry allegedly suffered a protracted period of asystole and hypoxemia with encephalopathic symptoms leading to a comatose state which has persisted to this day.
Mary T. Berry, Berry’s wife (hereinafter plaintiff), was appointed Berry’s conservator in March 1985 by order of Justice Edward S. Conway. Plaintiff commenced this lawsuit against the above-named defendants in or about March 1986 seeking damages for, inter alia, pain and suffering, medical expenses, and other economic loss. The causes of action against St. Peter’s Hospital were settled in 1995 for approximately $1 million. The settlement was earmarked as payment for conscious pain and suffering. The proposed intervenors were neither notified prior thereto of the settlement, nor did they participate therein. The causes of action against the remaining defendants are scheduled to be tried on June 2, 1997.[1]
Prior to the date of injury, Berry was a Capitol police officer for the State of New York. As a State employee, he was insured under the Empire Plan Health Insurance program administered by Metropolitan. Bérry also was a named insured on his wife’s health insurance policy provided by her employer AT&T.[2] Under these policies, Metropolitan and Lucent have paid out roughly $1.75 million and $1.8 million, respectively, for medical expenses related to the injuries sustained in 1983.[3] Both Metropolitan and Lucent claim subrogation rights on these payments.[4]
*218 The genesis of the current motions[5] is the failure of the original parties to include any amount for medical expenses in the settlement of the claims against St. Peter’s Hospital. Because that settlement was specifically categorized as an award for pain and suffering, Metropolitan and Lucent had no right of subrogation as to it (see generally, Teichman v Community Hosp., 87 NY2d 514). Thus, Metropolitan and Lucent (hereinafter collectively the intervenors) seek to intervene in the current case to prevent such a settlement between plaintiff and the remaining defendants from happening again, and to represent and protect their interests at trial.
LAW
The motions of the intervenors raise several complex substantive and procedural questions which must be addressed by this court. First, whether intervention as of right (see, CPLR 1012) or in the court’s discretion (see, CPLR 1013) is available in this case? Second, if intervention is available, what are the bounds of that intervention? Third, does intervention raise an inherent conflict with the "collateral source” rules stated in CPLR 4545? And fourth, what, if any, other procedural vehicle, might achieve an appropriate result? Each of these questions will be addressed below.
The Propriety of Intervention
The first issue before the court is whether the intervenors can show a basis for their involvement in the lawsuit. The primary rationale offered by the intervenors is that, without intervention in the settlement and/or trial of this action, experience shows that defendants and plaintiff would likely settle this matter for pain and suffering only, thus barring intervenors from collecting any of the moneys paid for medical expenses.
CPLR 1012 provides in relevant part:
"(a) Intervention as of right. Upon timely motion, any person shall be permitted to intervene in any action * * *
"2. when the representation of the person’s interest by the parties is or may be inadequate and the person is or may be bound by the judgment” (CPLR 1012 [a]). Under the statute, an intervenor is given a right to intervene *219 when it shows that it has unrepresented or inadequately represented rights or obligations in dispute which might be affected by a disposition. It appears that such right to intervene exists here.
An alternative avenue for granting intervention under the CPLR, known as permissive intervention, is also applicable to the current case, and is found in CPLR 1013. CPLR 1013 provides in relevant part: "Upon timely motion, any person may be permitted to intervene in any action * * * when the person’s claim or defense and the main action have a common question of law or fact. In exercising its discretion, the court shall consider whether the intervention will unduly delay the determination of the action or prejudice the substantial rights of any party”. It was this section of the CPLR that was relied on by the Court of Appeals in its seminal case, Teichman v Community Hosp. (87 NY2d 514, supra).
In Teichman (supra), the Court of Appeals held that intervention was appropriate for an insurance company who sought to intervene to block a settlement agreement which did not protect its subrogation rights. While Teichman also explores supplemental issues, the Court nevertheless agreed that the proper focus on the intervention determination was "that MetLife’s claim for a refund could be adversely affected if intervention were not allowed, that there were common questions of law and fact, and that no prejudice was shown in allowing intervention” (Teichman v Community Hosp., supra, at 522). In these respects, the current case presents issues identical to the Court of Appeals issues in Teichman.
Defendants make much of the fact that the rights of intervenors are being litigated and protected in the pending Federal lawsuit and, therefore, the prejudice caused by intervention should outweigh the intervenors’ interests in intervening. This argument, however, does not take into account the fact that the current State lawsuit will necessarily bind Metropolitan and Lucent if plaintiff and defendants settle for an amount which does not include medical expenses — i.e., a representation that the entire settlement was for pain and suffering only (as occurred in the prior settlement with St. Peter’s Hospital). Regardless of the existing Federal litigation, if plaintiff and defendants herein reach a settlement or a judgment after trial which does not include payments for medical expenses, the intervenors’ rights to subrogation are eliminated.
*220 DEFENSES TO MOTIONS FOR INTERVENTION
The defenses raised by plaintiff and defendants, while deserving of consideration, are generally without merit.
A. The Statute of Limitations Defense
First, the original parties raise the defense of Statute of Limitations. As can be seen from a review of the facts set forth in Teichman v Community Hosp. (supra), a Statute of Limitations defense does not lie against Metropolitan or Lucent with respect to intervention in the settlement proceedings.[6] Whether such a defense lies against the intervenors as to trial is another question.
The original parties assert that intervenors’ motions are untimely as they were interposed more that 13 years after the injury to Berry. CPLR 214-a generally provides a 21/2-year limitations period for the commencement of a medical malpractice action. Here, the intervenors have clearly failed to commence this action within the statutory period set forth under CPLR 214-a. As the intervenors suggest, however, the "relation back” doctrine, as generally set forth in CPLR 203 (f) and developed in case law, would appear to protect the intervenors herein. " '[W]hen a new party plaintiff is joined in order to allow it to assert a claim on its behalf, its claim will be deemed to have been interposed as of the time of the interposition by the preexisting plaintiff of its similar or identical claim’ ” (State of New York v General Elec. Co., 199 AD2d 595, 598, quoting Key Intl. Mfg. v Morse/ Diesel Inc., 142 AD2d 448, 458). Because the intervenors’ claims are simply for payment of medical expenses, a claim already made in plaintiff’s complaint, the relation back doctrine appears to protect them and allow the intervention of this claim at this late juncture, even after the normal running of the Statute of Limitations.
B. The Collateral Source Rule Defense[7]
Second, the original parties contend that the collateral source rule, as described in CPLR 4545, would be applicable to *221 a judgment after trial, provides a complete defense to reimbursement for interveners’ medical payments, and/or negates the ability of plaintiff, and therefore intervenors, to collect medical expenses in the pending lawsuit. This view of CPLR 4545 is without merit.
Under CPLR 4545, the Trial Judge has an obligation to reduce a jury verdict if a plaintiff has received payments from a collateral source, as defined in the statute. Because evidence of a party’s insurance status is generally inadmissible at trial due to its prejudicial effect on a jury (see, Simpson v Foundation Co., 201 NY 479; see also, Barker and Alexander, Evidence in New York State and Federal Courts § 411.1, at 196-197), CPLR 4545 sets forth a procedure by which a Trial Judge may hear evidence on collateral sources of payment after a verdict has been reached (see, CPLR 4545 [a], [c]). The Judge may then reduce the jury verdict by an amount equal to the collateral source, less any premiums necessary to maintain the coverage (see, CPLR 4545 [a], [c]).
Where, however, a party has a legal or equitable obligation to repay a sum to its insurance company under a subrogation clause in the insurance contract or the doctrine of equitable subrogation (see generally, Winkelmann v Excelsior Ins. Co., 85 NY2d 577, supra), there is no actual collateral source. The moneys received for medical expenses in the verdict are immediately payable to the party with subrogation rights, completely offsetting the collateral source received by plaintiff prior to trial.
This reading of the scope of the collateral source rule is supported by the legislative history of the statute and its predecessor as well as the case law and commentaries surrounding it (see, Mem of Assemblyman Tallon, 1981 NY Legis Ann, at 153 [discussing approval of CPLR former 4010]; Governor’s Approval Mem, 1981 NY Legis Ann, at 154-155 [discussing approval of CPLR former 4010]; Governor’s Program Mem, 1986 NY Legis Ann, at 135-136 [discussing approval of CPLR 4545]; see also, Kelly v Seager, 144 Misc 2d 458, affd 163 AD2d 877 *222 [intervention appropriate because CPLR 4545 did not bar collection]; Weisner v Meyer & Kathy Bake Shop, NYLJ, July 29, 1996, at 29, col 2; cf., Humbach v Goldstein, 229 AD2d 64; and see, Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C4545:2, at 348-349; Alexander, 1996 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C4545:2, 1997 Pocket Part, at 48). The application of the collateral source rule to subrogation rights such as those held by the intervenors here would sound the death knoll for the subrogation doctrine in medical malpractice and other personal injury cases.
It is clear that CPLR 4545 and its predecessor, CPLR former 4010, were passed to "eliminate double and triple recoveries for the same damages in medical malpractice actions” and, by subsequent amendment, in all personal injury actions (see, Mem of Assemblyman Tallón, 1981 NY Legis Ann, at 153). While the Governor and Legislature recognized that this would have the effect of reducing medical malpractice liability insurance premiums (see, Governor’s Approval Mem, 1981 NY Legis Ann, at 154-155; Governor’s Program Mem, 1986 NY Legis Ann, at 135-136), there is no evidence that they wished to do so at the expense of health care carriers (see, 1986 NY Legis Ann, at 136). Indeed, the Court of Appeals enunciated a strong policy in favor of subrogation of medical expenses paid by health care carriers when it said: "Allowing MetLife to seek a refund of any medical expense payments included in the settlement both prevents a potential double recovery by plaintiffs and assures that tortfeasors, not ratepayers, will ultimately bear the expense” (Teichman v Community Hosp., 87 NY2d, supra, at 523). Thus, it cannot be said that the collateral source rule would act as a bar to the intervenors’ collection of their medical expenses in this case were a jury to make an award for such expenses after trial. The trial court would simply find that plaintiff owed the intervenors a repayment, pursuant to their subrogation rights, for any sums it recouped in the judgment. No double recovery would be had.
The original parties offer the Second Department case Humbach v Goldstein (229 AD2d 64, supra) in support of their argument that intervention is inappropriate. In Humbach, the Court found that intervention under similar circumstances was not appropriate for several reasons: (1) the intervenor’s motion was premature in that the intervenor would not actually gain a cause of action until plaintiff received *223 a judgment (see, Humbach v Goldstein, supra, at 66-67); (2) that the intervener’s motion was moot because, were the case to proceed to trial, plaintiffs verdict would be reduced by collateral sources under CPLR 4545 (c) (or CPLR 4545 [a] in medical malpractice cases) (see, supra, at 67); and (3) that intervention was unnecessary because plaintiff had admitted that the intervenor had a lien on any recoveries made (see, supra, at 69). To the extent that Humbach deviates from the holdings in the above cases — specifically with the Court of Appeals decision in Teichman (supra) — it must, in order to avoid an unseemly judicial conflict, be assumed that the Second Department was distinguishing the cases on the basis of the lien reserved by the intervenors in Humbach. Any other view inevitably leads one to the conclusion that Humbach creates an irreconcilable and impermissible detour from the holding of the Court of Appeals in Teichman.
C. The Equitable Defense of Laches
Third, the original parties raise the equitable defense of laches, specifically citing the language in both CPLR 1012 and 1013 which grants intervention only "[u]pon timely motion” (see, CPLR 1012 [a]; 1013). The Court of Appeals has defined laches as: " ' "[N]eglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.” * * * The essential element of this equitable defense is delay prejudicial to the opposing party’ ” (Matter of Schulz v State of New York, 81 NY2d 336, 348, quoting Matter of Barabash, 31 NY2d 76, 81). Thus, the court must consider whether the intervenors’ failure to commence their actions before the dawn of trial constitutes " 'delay prejudicial to the opposing parties]’ ” (Matter of Schulz v State of New York, supra).
The original parties have asserted that the delay is prejudicial because it makes the trial too complex and interferes with the order of proof. While it is true that the trial will be made slightly more complex, the mere presence of the intervenors will not so prejudice the original parties as to invoke the laches doctrine. Further, the extra complexity is more than compensated for by the benefits of the immediate resolution of a good portion of the multitude of issues involved in this type of case. Regardless of the intervenors’ presence, the plaintiff will have to put proof on the record as to its medical expenses if it wishes to recover them. Moreover, inasmuch as intervenors *224 are parties at trial, the court can limit their role so as to simply protect their subrogation rights — the interveners have asserted that they need nothing more.
Limits on Intervention
While the court finds that intervention could be appropriately granted under either CPLR 1012 or 1013, it believes that the instant facts and circumstances require a strong degree of judicial control over the proceedings and, therefore, opts to grant intervention pursuant to CPLR 1013. With that in mind, it is appropriate to discuss the scope of the intervention and set limits thereon so as to maintain the forward motion of the lawsuit, and to avoid a prejudicial entry into the trial of interveners as the source of the medical benefits.
As previously discussed, the Court of Appeals has spoken on the issue of intervention in settlement proceedings (see, Teichman v Community Hosp., 87 NY2d, supra, at 523) and, therefore, this court will not place any limits on the intervenors’ rights therein. Both Metropolitan and Lucent will have all the rights and duties of the original parties with respect to the pretrial phase of this lawsuit. Any settlement proposal seeking to globally dispose of this matter will require their approval.[8] These rights are conveyed to protect the intervenors from actions by the original parties intended to unfairly limit the scope of a proposed settlement (see, Niemann v Luca, 168 *225 Misc 2d 1023; Weisner v Meyer & Kathy Bake Shop, NYLJ, July 29, 1996, at 29, col 2, supra).
The intervenors’ role at trial raises different issues. As the Second Department noted in Humbach v Goldstein (229 AD2d 64, supra), several problems might be posed by full trial intervention. First, such interventions could cause conflicts and create adversarial postures between insurer and insured, unduly delaying trial of the matter (see, Humbach v Goldstein, supra, at 68). Second, "[s]imple personal injury actions would be transformed into complicated, unmanageable, multiparty litigation” (supra, at 68). Finally, "submission of issues to the jury relating to the plaintiff’s compensation from collateral sources could prejudice the plaintiff’s case by permitting the jury to speculate that the plaintiff already has been compensated”- (supra, at 68). However, while this parade of horribles does present significant problems resulting from intervention, each of those problems can be mitigated or eliminated through procedural restrictions on the intervention.
Because the intervenors have explicitly stated that they would be willing to take a very limited role in the trial of this action, it does not appear that the order of proof will be compromised at trial. In fact, so long as plaintiff places proof of her medical expenses on the record for the jury’s consideration, there will be no need for the intervenors’ participation, nor for identification of the collateral source. If, however, for some reason, the plaintiff elects not to place such proof on the record, this court will allow intervenors to have a limited role in placing such evidence on the record during plaintiff’s case-in-chief, but without identification of the collateral source. Care must be given in the charge by the Trial Judge to admonish the jury to ignore any consideration of the source of such medical payments.
Moreover, if the court perceives additional problems with issues surrounding the intervention of Metropolitan and Lucent during trial of this action, it has the option to sever the intervenors’ claims pursuant to CPLR 603. That section provides: "In furtherance of convenience or to avoid prejudice the court may order a severance of claims, or may order a separate trial of any claim, or of any separate issue” (CPLR 603). Thus, if, in the future, the court believes that the intervenors’ interests will somehow interfere with the orderly progression of this action, it will sever those claims or issues from the *226 main action. Attention will need be given to the rule forbidding a party from splitting a cause of action.[9]
CUTTING THE GORDIAN KNOT[10]
CONCLUSION
For the foregoing reasons, the motions of the intervenors to intervene in this action are granted pursuant to CPLR 1013, in accord with the substantive and procedural patterns heretofore set forth. The intervenors have all rights and obligations of original parties with respect to any settlement of this action. The role of the intervenors at trial will be limited to the protection of their rights via the offering of evidence of the medical payments made on Berry’s behalf, or to be made in the future, if plaintiff fails to offer such evidence.

. By letter dated May 21,1997, copies of which were provided to the parties, this court removed this case from the Trial Calendar so that the current issues could be decided.

. Lucent Technologies Inc. is the successor to the division of AT&T which employed plaintiff. Lucent maintains its own employee health insurance coverage in lieu of paying a third-party insurer to cover its employees.

. Plaintiff has initiated a separate action in United States District Court seeking to compel Metropolitan and Lucent to continue paying Berry’s medical expenses. As part of that case, Metropolitan and Lucent have counterclaimed for the payments they have made for Berry’s hospitalization.

. Metropolitan’s policy contains a subrogation clause. Lucent pursues repayment under equitable subrogation (see, Winkelmann v Excelsior Ins. Co., 85 NY2d 577).

. The current motions to intervene were commenced by orders to show cause on March 28, 1997 (Metropolitan) and April 24, 1997 (Lucent). They were returnable on May 2, 1997 and a hearing was held on May 14, 1997 in which the parties presented additional argument to this court.

. In Teichman (supra) the motion of the intervenor was made after the terms of the settlement had been agreed upon, but prior to the trial court’s formal approval.

. CPLR 4545 partially abolishes the "collateral source rule” in most tort actions. The common-law rule in New York, as in most jurisdictions, is that a plaintiff’s damages are not reduced by the amount plaintiff has received from collateral sources, such as insurance (see, Healy v Rennert, 9 NY2d 202, 206). "The theory underlying the collateral source rule is simply that a negligent defendant should not, in fairness, be permitted to reduce its liability in damages by showing that the plaintiff is already entitled by *221 contract or employment right to reimbursement for such items as medical expenses and lost wages” (Kish v Board of Educ., 76 NY2d 379, 384). The rule is subject to criticism, of course, because it permits double recovery for the same injury.
The collateral source offset of CPLR 4545 applies only to economic losses, i.e., out-of-pocket damages for medical care, custodial care or rehabilitative services, loss of earnings or "other economic loss”. To the extent the plaintiff has received reimbursement of some kind for intangible losses, such as pain and suffering and noneconomic loss, CPLR 4545 is inapplicable.

. The court notes approval of such settlements is not without precedent in the law of this State, albeit on a statutory basis. Under Workers’ Compensation Law § 29 (5), the approval of the compensation insurance carrier is required to validate any settlement or discontinuance of a third-party action (see, Workers’ Compensation Law § 29 [5]; Matter of Vincent v Geneva Pizza, 196 AD2d 917; Matter of Daly v Daly Constr. Corp., 136 AD2d 798, lv denied 72 NY2d 807).
In 1975, based on a study by and pursuant to a recommendation of the Law Revision Commission, section 29 of the Workers’ Compensation Law was amended to require equitable apportionment of litigation costs (including attorney fees) as between claimant and compensation carrier. The case law following the 1975 amendment largely addressed the question of assessing the carrier’s present lien only with little or no mention of "equitable apportionment” relative to the carrier’s valuable Workers’ Compensation Law § 29 (4) credit (offset) rights (consisting of future compensation and medical benefits).
The latter issue, as well as the issue of past benefits, was addressed by the Court of Appeals in Matter of Kelly v State Ins. Fund (60 NY2d 131) which formally embraced a "total benefit” theory in assessing the compensation carrier’s equitable share of litigation expenses (see, "kelly” and the Workers’ Compensation Interplay, compiled by Carl D. Copps, Esq., and James S. Fielder of the State Insurance Fund).

. If a cause of action is defined as a "set of operative facts giving rise to a right of redress”, this can be accomplished with minimal problem.

. In 333 B.C., Alexander the Great, on his march through Anotolia, reached Gordium, the capital of Phrygia. There he was shown the chariot of the ancient founder of the city, Gordius, with its yoke lashed to the pole by means of an intricate knot with its ends hidden. According to tradition, this knot was to be untied only by the future conqueror of Asia. In the popular account, Alexander sliced through the knot with his sword. The phrase, "cutting the Gordian knot”, has thus come to denote a bold solution to a complicated problem.